UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

STACY KNIGHT,

               Plaintiff,              **REPORT and RECOMMENDATION**

           -against-                 99 Civ. 3955 (RMB)(KNF)

JOHN P. KEANE, SUPERINTENDENT,
SING SING CORRECTIONAL FACILITY,
ET AL.,

               Defendants.
------------------------------------------------------------X

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE RICHARD M. BERMAN, UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

Plaintiff Stacy Knight ("Knight") brought this action pro se, pursuant to, inter alia, 42 U.S.C. § 1983 ("§ 1983"), alleging that rights secured to him by the First, Eighth and Fourteenth Amendments to the Constitution were violated by defendants John P. Keane ("Keane"), Superintendent, Sing Sing Correctional Facility, Harry Kerrigan ("Kerrigan"), Sergeant, Sing Sing Correctional Facility, Thomas Dixon ("Dixon"), Lieutenant, Attica Correctional Facility, and Donald Selsky ("Selksy"), Director of Special Housing Unit and Inmate Disciplinary Program, Department of Corrections ("DOCS") (collectively "defendants").[1] Knight alleges that

---

[1] By order dated October 16, 2002, the assigned district judge adopted the Court's recommendation that defendants' motion to dismiss be granted with respect to: a) claims brought pursuant to 42 U.S.C. § 1985; and b) all claims made against Superintendent Keane. See Knight v. Keane, 247 F. Supp. 2d 379, 383 (S.D.N.Y. 2002)(adopting portions of the Court's Report and Recommendation to which no objections were made). Plaintiff's Eighth Amendment claim also
                                                                                                                                                                    (continued...)

his Fourteenth Amendment right to procedural due process was violated when the defendants caused him to be confined in keeplock[2] for 365 days following a disciplinary hearing in which plaintiff was found guilty of violating a prison rule. In addition, plaintiff contends that his First Amendment right to receive and send mail was violated when the defendants seized his personal correspondence in contravention of prison rules and regulations.

Before the Court is the defendants' motion for summary judgment, made pursuant to Fed. R. Civ. P. 56. They contend that plaintiff's complaint should be dismissed because: (1) the examination of plaintiff's mail was reasonably related to substantial governmental interests and, therefore, was not a First Amendment violation; (2) plaintiff was not deprived of his right to due process under the Fourteenth Amendment; and (3) they are shielded from liability to the plaintiff by the doctrine of qualified immunity. The defendants' motion is addressed below.

## II. BACKGROUND

On October 8, 1996, while plaintiff was housed at the Sing Sing Correctional Facility ("Sing Sing"), an incident occurred during which three inmates were stabbed ("the stabbing incident"). As a result of these assaults, which were related to gang activity, and after contraband was found, corrections personnel conducted an investigation. In furtherance of the investigation, the A block area of the facility was placed under a lockdown during which inmates were

---

[1](...continued)
was dismissed without prejudice and with leave to plaintiff to amend the complaint within 30 days. See id. at 388. There is no evidence in the record that plaintiff ever renewed his Eighth Amendment claim by filing an amended complaint; additionally, plaintiff stated in his deposition, dated August 25, 2004, that he had elected not to pursue this claim.

[2]Keeplock is "a form of administrative segregation in which an inmate is confined to his cell and denied participation in normal prison activities, as well as telephone and commissary privileges." Wright v. Coughlin, 132 F.3d 133, 135 (2d Cir. 1998).

2

restricted to their cells. At the time, plaintiff was housed in the P unit of Sing Sing's A block. In his deposition, dated August 25, 2004, plaintiff stated that the lockdown took place between October 8, 1996, and October 12, 1996. The defendants' Local Rule 56.1 statement also places the lockdown during this four-day period. However, both the complaint and a notice issued by Director Selsky, which was read into the record during a disciplinary hearing held in connection with plaintiff's alleged participation in the stabbing incident, state that the lockdown commenced on October 13, 1996, and continued at least through October 15, 1996.

On October 12, 1996, a friend of the plaintiff named "Uni" was assaulted in or near the facility's dining hall. After that assault, corrections personnel approached the plaintiff and told him that they had received information from informants that he was a leader of the Bloods gang, that he could be attacked and that he could be in possession of a weapon. Plaintiff was then escorted from his cell and frisked, and a weapon was found. As a result of this infraction of prison regulations, plaintiff was placed in the facility's Special Housing Unit ("SHU").

While he was in SHU, plaintiff wrote a letter to his mother. In the letter, dated October 13, 1996, plaintiff stated that he was in SHU on a weapons charge and that he had the weapon because "a friend of mine got stabbed in front of me by some Puerto Ricans (Latin Kings), and I cut three of them." In his letter, plaintiff also explained the circumstances that led to his placement in SHU and stated that there was "a civil war going on between the 'Bloods' and Latin Kings right now." Plaintiff stated subsequently that the contents of the letter were true, except for the part in which he wrote that he had "cut" three inmates.

As part of the investigation of the stabbing incident, a mail watch was conducted and plaintiff's letter to his mother was seized by prison officials. In his affirmation, dated December

3

15, 2004, Sgt. Kerrigan,[3] who was head of the Crisis Intervention Unit at Sing Sing at the time, stated that, although lockdowns occur "only very rarely," it is "standard procedure" to conduct a mail watch during a lockdown because "inmates will use the mail to dispose of illegal contraband." Sgt. Kerrigan also affirmed that authorization had been given to conduct the mail watch and that it was instituted "in an effort to determine who was the inmate or inmates behind the assaults and to stop future assaults." On or about October 15, 1996, plaintiff was transferred to the Attica Correctional Facility ("Attica").

Thereafter, on October 19, 1996, Sgt. Kerrigan filed a misbehavior report charging the plaintiff with having violated a prison disciplinary rule by assaulting other inmates. Attached to the report was plaintiff's letter to his mother. The letter was used as evidence against plaintiff at a Tier III disciplinary hearing conducted by defendant Lt. Dixon at Attica. The disciplinary hearing began on October 30, 1996, and concluded on November 5, 1996. Plaintiff pleaded not guilty to the charges lodged against him.

During the hearing, plaintiff claimed that he was locked in his cell at the time of the stabbing incident and, thus, could not have been the assailant. Plaintiff also claimed that one of the individuals who was attacked, Raul Torres ("Torres"), was his friend. Torres was called by plaintiff as a witness during the hearing. Torres, appearing by telephone, confirmed that he knew the plaintiff, that he had gotten slashed in the head during the stabbing incident and that he was unable to identify the perpetrators. Additionally, Torres stated that after he was assaulted, plaintiff took hold of him, asked him if he was alright and then led him to a corrections officer so

---

[3]Defendant Kerrigan held the rank of Sergeant at Sing Sing at all relevant times. On October 21, 1999, Kerrigan was promoted to the rank of Lieutenant.

4

that he could be escorted to the facility's infirmary.

Corrections Officer J. Perez also appeared, by telephone, as a witness at the hearing. Officer Perez stated that he was the officer in charge in the A block at Sing Sing when the stabbing incident occurred and that he had witnessed that event. Officer Perez also stated that although he was unable to identify the perpetrator or the victims, he was able to provide a description of an individual who may have been involved. Officer Perez stated that he did not recall seeing anyone answering to plaintiff's description during the stabbing incident and had not heard plaintiff's name called out at the time.

The final witness to testify at the hearing was Sgt. Kerrigan. Sgt. Kerrigan, who also testified by telephone, stated that plaintiff's letter had been found as a result of the investigation and lockdown following the stabbing incident. In response to a question from the plaintiff, Sgt. Kerrigan stated that he believed the mail watch had been authorized by a superintendent at Sing Sing. When Knight attempted to put additional questions to Sgt. Kerrigan, the following exchange took place:

> Knight: [U]nder what stipulations . . . did the Superintendent . . . say that my mail should be censored?
>
> Lt. Dixon: He's already responded to [that], who[se] mail was being watched, next question?
>
> Knight: He said -
>
> Lt. Dixon: He's already responded to who[se] mail was being watched, next question.
>
> Knight: This is my question, for what reason?
>
> Lt. Dixon: He has already given that response, next question.
>
> Knight: Yeah but he said a facility lock down, he didn't say

5

                specifically that I was under -

Lt. Dixon:      But he has already responded to that question, next question.

In later testimony, Sgt. Kerrigan stated that if Knight had become a suspect during the investigation following the stabbing incident, his name would have appeared on the Unusual Incident Report that was prepared at the time.

During the hearing and in his complaint, plaintiff objected to the seizure and use of the letter he had written to his mother. Plaintiff claimed that the interception of his correspondence constituted "unauthorized censorship" and violated his First Amendment rights. Plaintiff claimed further that the letter had been opened and read in violation of prison regulations, which required corrections personnel to obtain written authorization from the facility superintendent before inspecting an inmate's outgoing correspondence.[4] According to plaintiff, although Sgt. Kerrigan testified at the disciplinary hearing that he believed the seizure of plaintiff's mail had been authorized by the facility superintendent, there was no record of such authorization and, moreover, Sgt. Kerrigan did not have sufficient independent information concerning plaintiff's alleged involvement in the stabbing incident to justify seizure of plaintiff's letter.

---

[4]The regulation at issue, section 720.3 of the New York Compilation of Codes, Rules and Regulations ("NYCRR"), in its most pertinent part, provides:
        Outgoing correspondence shall not be opened, inspected or read without express written authorization from the facility superintendent. . . .
        The superintendent shall not authorize the opening or inspection of such outgoing mail unless there is a reason to believe that the provisions of any department directive, rule or regulation have been violated, that any applicable state or Federal law has been violated, or that such mail threatens the safety, security, or good order of a facility or the safety or well being of any person. Such written authorization shall set forth the specific facts forming the basis for the action.
7 NYCRR § 720.3(e)(1).

Plaintiff maintained that the sole basis for prison officials' identification of him as a suspect in the stabbing incident and, thus, for the filing of the misbehavior report against him, was the information contained in plaintiff's letter. Plaintiff asserted that, if he had been identified as a suspect prior to the inspection of his outgoing mail, his name would have appeared in the Unusual Incident Report which was filed by Sgt. Kerrigan in connection with the stabbing incident. Plaintiff contends that since his name did not appear in that report, "as the record stands there [was] no valid reason to suspect plaintiff of [the] alleged assaults."

Following the disciplinary hearing, plaintiff was found guilty of assaulting other inmates; he received a penalty of 365 days in keeplock confinement, loss of telephone privileges and loss of good time credits. This determination was affirmed on appeal by defendant Selsky, Director of the SHU.

In November 1998, plaintiff commenced a New York Civil Practice Law and Rules Article 78 proceeding to have a court review the disciplinary hearing determination finding him guilty of violating a prison disciplinary rule. The Article 78 proceeding was transferred to the New York State Supreme Court, Appellate Division, Fourth Department, which annulled the determination of the disciplinary hearing officer and ruled that all references to the disciplinary charge brought against plaintiff be removed from his DOCS file. See Matter of Knight v. Goord, 255 A.D.2d 930, 681 N.Y.S. 2d 719 (App. Div. 4th Dep't 1998). In reaching its finding, the court concluded that the evidence used at the disciplinary hearing, that is, plaintiff's October 13, 1996, letter to his mother, had been seized in contravention of DOCS' rules and regulations. In his deposition, plaintiff testified that by the time the Appellate Division issued its decision in this case, he had already served a full year in keeplock confinement. Plaintiff seeks compensatory

and punitive damages.

In February 2000, the defendants moved to dismiss the complaint; that motion was granted in part and denied in part. See Knight, 247 F. Supp. 2d at 382. Thereafter the parties engaged in discovery. On December 16, 2004, the defendants filed the instant motion for summary judgment pursuant to Fed. R. Civ. P. 56. In support of their motion, defendants submitted, in addition to the affirmation of Sgt. Kerrigan and deposition of the plaintiff noted above, a transcript of plaintiff's disciplinary hearing, as well as other relevant documents.

Plaintiff submitted an opposition to the defendants' motion entitled "Memorandum of Law in Support of Plaintiff's Motion to Grant Summary Judgment and Dismiss Defendants' Motion of Qualified Immunity to Proceed to Trial," dated February 11, 2005, a declaration, a notice of motion and a statement pursuant to Local Rule 56.1. Defendants filed a reply memorandum on March 17, 2005.

### III. DISCUSSION

*Standard of Review*

Summary judgment may be granted in favor of the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). When considering a motion for summary judgment, "[t]he court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." L. B. Foster Co. v. America Piles, Inc., 138 F.3d 81, 87 (2d Cir. 1998) (citing Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 [1986]).

The moving party bears the burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986). Once the moving party has satisfied its burden, the non-moving party must come forth with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986).

In order to defeat a motion for summary judgment, the non-moving party cannot merely rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586, 106 S. Ct. at 1355. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48, 106 S. Ct. at 2510. The non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Id., at 256, at 2514. Summary judgment should only be granted if no rational jury could find in favor of the non-moving party. See Heilweil v. Mount Sinai Hospital, 32 F.3d 718, 721 (2d Cir. 1994).

Where, as here, a litigant appears before the court pro se, that litigant's submissions should be read liberally and interpreted so as "to raise the strongest arguments that they suggest." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999). However, this does not mean that the pro se litigant is released from the typical requirements of summary judgment. A "bald assertion" made by the pro se litigant that is not supported by evidence will not be sufficient to overcome a motion for summary judgment. See Lee v. Coughlin, 902 F. Supp. 424, 429 (S.D.N.Y. 1995).

## Section 1983

"To state a claim under § 1983, a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999)(citing Dwares v. City of New York, 985 F.2d 94, 98 [2d Cir. 1993]). "Allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under §1983." Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 887 (2d Cir. 1987).

In this Circuit, personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977) (citing Mukmuk v. Comm'r of Dep't of Correction Servs., 529 F.2d 272, 275 [2d Cir. 1976]). A §1983 complaint must contain allegations that a defendant is "directly and personally responsible for the purported unlawful conduct." Alfaro, 814 F.2d at 886 (citing Black v. U.S., 534 F.2d 524, 527-528 [2d Cir. 1976]); see also Lee v. State of New York Dep't of Correctional Servs., No. 97 Civ. 7112, 1999 WL 673339, at *15 (S.D.N.Y. Aug. 30, 1999).

In this case, the court found previously that plaintiff alleged facts indicating that defendants Sgt. Kerrigan, Lt. Dixon and Director Selsky were personally involved in the purported constitutional violations and, consequently, that the record evidence was sufficient to permit a § 1983 action to go forward against them.[5] See Knight, 247 F. Supp. 2d at 382-383.

---

[5]The court also found that plaintiff had exhausted his administrative remedies with respect to his First and Fourteenth Amendment claims by appealing the disciplinary hearing determination. See Knight, 247 F. Supp. 2d at 388 n.10.

10

*First Amendment Claim*

"[P]rison restrictions that implicate prisoners' constitutional rights may be upheld if they are 'reasonably related to legitimate penological interests.'" Duamutef v. Hollins, 297 F.3d 108, 112 (2d Cir. 2002)(quoting Turner v. Safley, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 [1987]). While prison inmates have a First Amendment right in the free flow of their mail, both incoming and outgoing, see Heimerle v. Attorney General, 753 F.2d 10 (2d Cir. 1985), the interception of a prisoner's correspondence does not violate that individual's First Amendment rights "if prison officials had 'good' or 'reasonable' cause to inspect the mail." United States v. Felipe, 148 F.3d 101, 108 (2d Cir. 1998)(citing United States v. Workman, 80 F.3d 688, 699 [2d Cir. 1996]).

"[T]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." Thornburgh v. Abbott, 490 U.S. 401, 413, 109 S. Ct. 1874, 1882 (1989). "Therefore, the penological interests for interference with outgoing mail must be more than just the general security interest which justifies most interference with incoming mail." Cancel v. Goord, No. 00 Civ. 2042, 2001 WL 303713, at *5 (S.D.N.Y. Mar. 29, 2001).

"[T]he investigation and prevention of illegal activity among inmates is a legitimate penological interest, which has a logical connection to the decision to impose a mail watch on a prisoner." Felipe, 148 F.3d at 108; see also Thornburgh, 490 U.S. at 412, 109 S. Ct. at 1881 (finding that dangerous outgoing correspondence, which would support a finding of good cause, may include "escape plans, plans relating to ongoing criminal activity, and threats of blackmail or extortion."). Moreover, the "policy of deference [applicable in cases where federal courts undertake a review of prison policy and administration] is heightened with respect to the specific

11

issue of 'maintaining prison security and protecting against increased inmate violence.'"
Duamutef, 297 F.3d at 112 (quoting Giano v. Senkowski, 54 F.3d 1050, 1053 [2d Cir. 1995]).

Based on a review of the evidence submitted by the parties prior to and during discovery in this case, the Court finds that the confiscation of plaintiff's mail was within constitutional bounds. Under the circumstances, defendants had good cause, in the interest of prison security, to open and inspect plaintiff's October 13, 1996 letter to his mother.

As noted above, plaintiff's letter was opened and inspected in the course of a mail watch that was instituted following the stabbing incident.[6] Plaintiff is correct in stating that, prior to the seizure of his letter, corrections personnel apparently had no particular reason to suspect him of participation in the stabbing incident. Even if plaintiff was not locked in his cell when the stabbing incident occurred, as he has claimed, his name did not appear in the Unusual Incident Report that was prepared by Sgt. Kerrigan at that time. However, it does not follow that corrections personnel did not have good cause to inspect the plaintiff's mail. The record in this case indicates that, not only plaintiff, but all of the inmates housed in the area of Sing Sing where the stabbing incident occurred were subject to a mail watch during the investigation conducted following the assaults. Under the circumstances, the implementation of a mail watch was not improper: prison officials were concerned to discover the perpetrators of the assaults and prevent future assaults in the context of violent, gang-related activity necessitating an area-wide

---

[6] According to Sgt. Kerrigan, the mail watch was conducted during the lockdown. As noted earlier in this writing, there is a discrepancy in the record concerning the dates on which the lockdown took place. If, as one account suggests, the lockdown took place between October 8 and October 12, 1996, then the plaintiff's letter could not have been found during the lockdown, since it was not written until October 13, 1996. Hence, either the lockdown did not end on October 12, 1996, or else the mail watch continued after the lockdown was lifted.

lockdown. Further, given the need to maintain prison security, the penological interest in interference with the inmates' outgoing mail was more than a general security interest.

Moreover, after plaintiff was found with a weapon, on October 12, 1996, and in light of information provided by informants, that he was a leader of one of the gangs allegedly involved in the stabbing incident, prison officials could reasonably have suspected plaintiff of participation in that incident and, as a result, have focused their investigative efforts on him. Therefore, the inspection of plaintiff's mail was based on a reasonable suspicion of his continuing criminal activity and was reasonably related to legitimate penological interests. Accordingly, the Court finds that the inspection of plaintiff's mail did not violate his First Amendment rights as a matter of law.[7]

*Due Process Claim*

A plaintiff asserting a due process claim "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001). A prisoner's liberty interest is implicated by prison discipline, such as segregated confinement, only if the punishment "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484, 115 S. Ct. 2293, 2300 (1995).

---

[7]As noted above, the Appellate Division found, at the conclusion of an Article 78 proceeding, that plaintiff's letter was seized in contravention of DOCS' rules and regulations. The violation of a prison regulation does not necessarily constitute the deprivation of a constitutional right. Where, as here, the regulation involved has been found to be constitutional and, indeed, to afford prison inmates more protection than the Constitution requires, plaintiff's First Amendment right to receive and send mail would not have been violated by defendants' failure to obtain the proper authorization before seizing plaintiff's letter. See, e.g., France v. Coughlin, No. 85 Civ. 6347, 1987 WL 10724, at *4 (S.D.N.Y. May 4, 1987)(citing Golden v. Coombe, 508 F. Supp. 156, 160 [S.D.N.Y. 1981]).

In determining whether a disciplinary penalty involving segregated confinement rises to the level of an "atypical and significant hardship," the Second Circuit has instructed district courts to consider: (1) the extent to which the conditions of the disciplinary segregation differ from routine prison conditions; and (2) the duration of the disciplinary segregation. See Sims v. Artuz, 230 F.3d 14, 22 (2d Cir. 2000).

The Second Circuit has not established a "bright-line rule" governing the duration of segregated confinement that rises to the level of a due process violation under Sandin. However, segregated confinement penalties of 125 to 288 days are considered "relatively long." See Sales v. Barizone, No. 03 Civ. 6691, 2004 WL 2781752, at *6 (S.D.N.Y. Dec. 2, 2004) (quoting Sims, 230 F.3d at 23) (finding one year of SHU confinement to be "atypical and significant hardship"). Furthermore, the Second Circuit has held that "confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under Sandin." Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000).

SHU confinement typically involves an extremely restrictive regimen. Inmates are required to remain in their cells 23 hours per day, are permitted three showers and one exercise period per week, and are given less than the normal daily food allowance. In his deposition, Knight testified that, in his case, keeplock confinement involved the same restrictions as those imposed in SHU, except that, in keeplock, the inmates were entitled to keep their personal property.

Based on the case history in this circuit, the Court finds that Knight's confinement in keeplock for 365 days qualifies as an "atypical and significant hardship," and, thus, implicates a

14

liberty interest.

The Second Circuit has explained that the due process protections afforded a prison inmate subjected to prison discipline include "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004). Furthermore,

> the Supreme Court has clarified that judicial review of the written findings required by due process is limited to determining whether the disposition is supported by "some evidence." This standard is extremely tolerant and is satisfied if there is *any* evidence in the record that supports the disciplinary ruling. Nevertheless, as this court recently explained, the "some evidence" standard requires some "reliable evidence."

Id. (citations omitted).

Due process requires that an accused inmate receive at least twenty-four hours written notice of the disciplinary charges against him prior to conducting a hearing. See Samuels v. Selsky, No. 01 Civ. 8235, 2002 WL 31040370, at *11 (S.D.N.Y. Sept. 12, 2002). In this case, plaintiff was served with a copy of the misbehavior report filed by Sgt. Kerrigan on October 23, 1996. The hearing commenced on October 30, 1996. Therefore, plaintiff was provided with sufficient notice of the charges brought against him. Plaintiff also was afforded a reasonable opportunity to call witnesses; as plaintiff acknowledged in his complaint, and as the record shows, the witnesses requested by plaintiff -- inmate Torres, Officer Perez and Sgt. Kerrigan -- did in fact testify at the hearing.

Plaintiff appears to claim that the officer who presided at his hearing, Lt. Dixon, failed to conduct the hearing in an impartial manner. According to plaintiff, when he "attempted to ask

15

what specific facts formulated the basis of the action [of seizing plaintiff's mail] . . . Lt. Dixon stopped plaintiff from ascertaining more information concerning the illegally seized letter."

As noted above, during the testimony of Sgt. Kerrigan, Lt. Dixon prevented plaintiff from asking questions about the basis for the seizure of plaintiff's mail. The Court finds, however, that Lt. Dixon's conduct at this stage of the hearing did not deprive the plaintiff of due process. Sgt. Kerrigan had made clear that the mail watch applied to all of the inmates in the A block at Sing Sing; from this it could be inferred that the mail watch was not directed at plaintiff exclusively. Under the circumstances, therefore, Lt. Dixon's determination to forestall continued questioning from the plaintiff on this subject was not improper.

Furthermore, plaintiff's disciplinary ruling appears to have been based on sufficient "reliable evidence" to satisfy due process. First, the misbehavior report filed by Sgt. Kerrigan provided a description of the stabbing incident, identified the date and time of the incident and stated the basis of the charge lodged against the plaintiff, namely, his admission in the letter seized during the mail watch that he had "cut" three other inmates. Consequently, the misbehavior report provided meaningful notice of the misconduct at issue. Cf. Sira, 380 F.3d at 70-72 (finding a due process violation where misbehavior report charging inmate with infractions of prison rules was impermissibly conclusory). Additionally, Sgt. Kerrigan, who prepared and signed the misbehavior report, appeared at the hearing and was interviewed by the hearing officer. Cf. Luna v. Pico, 356 F.3d 481, 489 (2d Cir. 2004)(finding that "some evidence" standard was not met where, inter alia, author of misbehavior report was not called to testify). During the interview, Sgt. Kerrigan affirmed that the information contained in the report had been obtained during the investigation conducted after the stabbing incident. Further, although

the misbehavior report failed to identify the incident site, Sgt. Kerrigan testified that the incident had occurred in the P unit of the A block at Sing Sing, where plaintiff was housed.[8]

Second, the testimony of inmate Torres, while confirming that he and plaintiff were known to each other, undermined plaintiff's contention that he could not have been a perpetrator of the assaults. Plaintiff had claimed that he was locked in his cell at the time of the stabbing incident; however, Torres recalled being aided by the plaintiff immediately after he was assaulted.

Finally, plaintiff's letter to his mother, written five days after the stabbing incident and containing plaintiff's admission that he had "cut" three other inmates, provided substantial evidence of plaintiff's guilt, notwithstanding plaintiff's contention that he had fabricated that part of the letter. As discussed earlier, because the seizure of the letter was not a violation of plaintiff's First Amendment rights, the introduction of the letter into evidence during the hearing was not improper. Furthermore, plaintiff acknowledged during his hearing testimony that he had been found in possession of a weapon several days after the stabbing incident, a fact which would tend to support the defendants' conclusion that plaintiff had participated in that event. Thus, the Court concludes that the information presented during plaintiff's disciplinary hearing constituted "reliable evidence" and was sufficient to support the finding of guilt.

---

[8] Sgt. Kerrigan also testified that the mail watch had been authorized by a superintendent at Sing Sing. As noted above, no record of such authorization was produced. Plaintiff contends that Sgt. Kerrigan, in so testifying, "lied to justify his arbitrary act of censorship." However, even if Sgt. Kerrigan testified falsely concerning the authorization for the mail watch, the seizure of plaintiff's mail was not arbitrary, but the result of a threat of continuing violence among the inmates in the area in which plaintiff was housed. Moreover, as noted above, the defendants' failure to obtain the proper authorization before seizing plaintiff's letter did not constitute a violation of plaintiff's First Amendment rights.

Under the circumstances, therefore, the Court finds that while the duration and conditions of plaintiff's confinement constituted an atypical and significant hardship, plaintiff has failed to present a due process violation. Accordingly, plaintiff's due process claim should be dismissed.

*Qualified Immunity*

The doctrine of qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982), or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights. See Anderson v. Creighton, 483 U.S. 635, 641, 107 S. Ct. 3034, 3039-3040 (1987); Lennon v. Miller, 66 F.3d 416, 425 (2d Cir. 1995). The doctrine of qualified immunity would protect a government official from personal liability in a § 1983 claim.

When evaluating a summary judgment motion based on a claim for qualified immunity in a § 1983 action, a court must first determine whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation. See Sira, 380 F.3d at 68-69 (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 [2001]). If not, "the plaintiff may not recover because he has suffered no wrong cognizable under § 1983." Id. at 69. If the facts do establish the violation of a constitutional right, however, the court must determine whether the right was clearly established at the time of the alleged violation. See, e.g., Duamutef, 297 F.3d at 111.

In this case, because there was no violation of a clearly established constitutional right, the Court finds that the defendants are entitled to qualified immunity. Therefore, the plaintiff's § 1983 claim is barred.

## IV. RECOMMENDATION

For the reasons set forth above, I recommend that the defendants' motion for summary judgment be granted with respect to the plaintiff's First and Fourteenth Amendment claims against defendants Sgt. Kerrigan, Lt. Dixon and Director Selsky. In addition, I recommend that the defendants' request that they be shielded from liability to the plaintiff by the doctrine of qualified immunity also be granted.

## V. FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Richard M. Berman, 40 Foley Square, Room 201, New York, New York, 10007, and to the chambers of the undersigned, 40 Foley Square, Room 540, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Berman. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. See Thomas v. Arn, 474 U.S. 140 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson,

968 F.2d 298, 300 (2d Cir. 1992); <u>Wesolek v. Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir. 1988); <u>McCarthy v. Manson,</u> 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
      August 26, 2005

Respectfully submitted,

*[signature]*
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

Copies mailed to:

Stacy Knight
# 90-T-2238

John E. Knudsen, Esq.